IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NIKKI WEBBER ALLEN

    v.

TV ONE, LLC

        :

        :

        :   Civil Action No. DKC 15-1960

        :

        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case are a motion for summary judgment filed by Defendant TV One ("Defendant") (ECF No. 89), and a cross motion for summary judgment filed by Plaintiff Nikki Webber Allen ("Plaintiff") (ECF No. 90). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motions for summary judgment will be denied.

## I. Background

### A. Factual Background[1]

A more complete recitation of the factual background can be found in the court's prior memorandum opinion denying Defendant's motion to dismiss. (ECF No. 27, at 1-8). Plaintiff began working as Director of Talent Relations and Casting for

---

[1] Unless otherwise noted, the facts outlined here are undisputed or presented in the light most favorable to Plaintiff, the nonmoving party as to Defendant's summary judgment motion. Plaintiff's cross motion for summary judgment will be analyzed separately.

Defendant when the television network launched in 2004. (ECF Nos. 89-4, at 34, pp. 127-28, 43, p. 164; 90-5, at 4).[2] Among other responsibilities, Plaintiff was charged with booking talent for TV One shows, including TV One-on-One, hosted by TV One's founder, chairperson, and board member Catherine Hughes. (ECF Nos. 89-4, at 34, p. 127; 90-6, at 34, p. 127). Ms. Hughes is also the mother of TV One Chief Executive Officer and President Alfred Liggins. (ECF No. 90-5, at 4). Plaintiff asserts that she was subjected to a pervasive pattern of sexual harassment and gender discrimination by Ms. Hughes during the course of her employment at TV One. (ECF No. 90-1, at 7). The crux of Plaintiff's claim is that Ms. Hughes insisted repeatedly that Plaintiff take up a romantic relationship with Mr. Liggins. (ECF Nos. 89-4, at 45-46, pp. 173, 175-77). During a business trip to Chicago in October 2004, Ms. Hughes allegedly said to Plaintiff, "I'm going to be your mother one way or another. Either you will marry [Mr. Liggins] or I will marry your father and be your stepmother." (ECF Nos. 89-4, at 45, p. 173; 90-6, at 45, p. 173). On another occasion, Ms. Hughes sternly questioned why Plaintiff had not married Mr. Liggins yet, stating that Plaintiff was old and "[her] babies would probably be retarded." (ECF Nos. 89-4, at 49, p. 187; 90-6, at 49, p.

---

[2] References to the record will be by ECF document and page numbers. For depositions printed with four pages per sheet, the internal page numbers will also be included.

187, 54, p. 207).  On various occasions, Ms. Hughes introduced
Plaintiff to others as her "future daughter-in-law," fueling
workplace rumors that Plaintiff and Mr. Liggins were
romantically involved.  (ECF Nos. 89-4, at 46, pp. 176-77; 90-6,
at 46, pp. 176-77, 49, pp. 188-89).  When Plaintiff complained
directly to Mr. Liggins about the rumors, he responded, "at
least it makes me look good."  (ECF No. 90-6, at 32, p. 118).
Once Ms. Hughes realized that Plaintiff was not going to marry
Mr. Liggins, she began to "baselessly attack" Plaintiff's job
performance, including publicly berating Plaintiff in front of
her co-workers (*Id.* at 53-54, pp. 205-06); demanding that
Plaintiff make requests for talent in a manner contrary to
standard industry protocol (*Id.* at 54-55, pp. 208-13); and
chastising Plaintiff for taking time off for her wedding and
honeymoon in 2012 (*Id.* at 56-57, pp. 214-18).  At a gathering of
TV One employees in January 2014, Mr. Liggins gave a speech
about the history of TV One and screened a video demo reel.
During his speech, Mr. Liggins falsely stated that Plaintiff
joined him in his hotel room to review the video when he was on
a business trip in Los Angeles.  (ECF Nos. 89-4, at 27-28, pp.
101-02; 90-6, at 27-28, pp. 101-02).  According to Plaintiff,
this statement further fueled rumors that Mr. Liggins and
Plaintiff were romantically involved.  (ECF Nos. 89-4, at 27-28,

pp. 101, 104-05, 31, pp. 114-15; 90-6, at 28, pp. 104-05, 31, pp. 114-15).

Plaintiff's employment was terminated in late June 2014 following a dispute with Ms. Hughes regarding the Essence Music Festival (the "Festival"). (ECF No. 90-19, at 2-3). Earlier in the month, Plaintiff's supervisor informed Plaintiff that Ayiko Broyard, an advertising agency executive and personal friend of Ms. Hughes, wanted the R&B Divas to perform on the McDonald's stage at the Festival. (ECF Nos. 89-4, at 129-30, pp. 367-71; 90-6, at 129-30, pp. 367-71). However, the R&B Divas were already booked for a performance on Walmart's stage. (ECF Nos. 89-4, at 127, p. 366; 90-6, at 131, pp. 377-78, 132, p. 382). Concerned about jeopardizing TV One's relationship with Walmart, Plaintiff communicated with Denise Bennett, the talent manager and TV One's account representative handling the Walmart account. (ECF Nos. 89-4, at 132, pp. 383-86; 90-6 at 131, pp. 376-77). After being told by Ms. Bennett that Walmart expected exclusivity with the R&B Divas, Plaintiff issued instructions to notify Ms. Broyard that TV One was unable to accommodate her request because of an existing agreement with Walmart. (ECF Nos. 89-4, at 131, p. 382, 359-60; 90-6, at 128, p. 366, 136, pp. 396-97). On June 22, Ms. Broyard informed Ms. Hughes that her request had been denied, and Ms. Hughes called Plaintiff's supervisor regarding the matter. (ECF No. 89-11, at 66, pp.

254-55, 67, p. 257). That afternoon, Plaintiff's supervisor e-mailed Plaintiff, asking her to call Ms. Hughes. (ECF Nos. 89-4, at 137, pp. 403-04, 362; 89-12, at 38, p. 141; 90-6, at 138, pp. 403-04).

Most of the remaining facts are in dispute. According to Plaintiff, when she called Ms. Hughes in the afternoon on June 22, Ms. Hughes "immediately started telling [her] off" and yelled and cursed at her for not speaking with Ms. Broyard directly regarding her request. (ECF No. 90-6, at 138, p. 405). While Plaintiff tried to speak calmly with Ms. Hughes "to diffuse the situation," Ms. Hughes "ke[pt] jumping in and yelling at [Plaintiff]." (*Id.* at 138, p. 406). When Ms. Hughes demanded that Plaintiff participate on a conference call the following day, Plaintiff informed Ms. Hughes that she would be unavailable and on approved leave out of town visiting her husband's family. In response, Ms. Hughes told Plaintiff, "I don't give a damn about your husband's family." (*Id.*). Believing that she hung up the phone on Plaintiff, Ms. Hughes began speaking to others in her company, referring to Plaintiff as "arrogant" and "incompetent," and stating in reference to Plaintiff, "I don't know who the hell this girl thinks she is, but I am writing her ass up." (ECF No. 90-6, at 139, pp. 408-10). According to Defendant, Ms. Hughes never yelled at Plaintiff during the conversation. Rather, Plaintiff yelled so

loudly at Ms. Hughes that Plaintiff's voice could be overheard by others through the phone. (ECF Nos. 89-8, at 49, pp. 190-92, 63, pp. 246-48, 75, p. 294; 89-11, at 68, pp. 263-64; 89-13, at 2; 89-14, at 2-3). According to Ms. Hughes, she told Plaintiff, "calm down," "[w]e only need five minutes of your time," and attempted to schedule a time for the conference call. (ECF No. 89-11, at 68, pp. 263-64). After Plaintiff refused, Ms. Hughes hung up the phone on Plaintiff. (*Id.* at 68, p. 264)

At about 9:30 a.m. on June 23, Plaintiff called TV One's Human Resources Vice President Sharon Alston and left a voice message stating:

> "I am making a complaint against Ms. Hughes for harassment. . . . [S]he cursed me out in a phone conversation yesterday when I told her that I was with my husband's family in Minnesota . . . I think she wants me fired because I told her previously that I wouldn't marry her son. Please call me as soon as possible so I can give you more details about my complaint."

(ECF No. 90-11, at 2-3). Plaintiff also e-mailed Ms. Alton, directing Ms. Alston to her voice message. (*Id.* at 3). Ms. Alston was not available but responded to Plaintiff's e-mail, stating that she was available to speak with Plaintiff in the afternoon. Plaintiff was not available at that time and requested to speak with Ms. Alston the following day (ECF No. 89-4, at 140, pp. 416-18, 366).

6

In the afternoon on June 23, Ms. Hughes contacted Jackie Kindall, Radio One's Senior Vice President of Human Resources, and told her about the call with Plaintiff. (ECF Nos. 89-8, at 29, pp. 110-11, 40, p. 155; 89-11, at 68-69, pp. 264-65). Ms. Hughes stated that she "wants [Plaintiff] out," "didn't want [Plaintiff] back in the building" and "Kimberly Dawkins can help fill in on the talent side for TV One when we fire [Plaintiff]." (ECF No. 89-8, at 36-37, pp. 140-43, 38, pp. 145-47). Ms. Kindall then contacted Ms. Alston, who "handle[s] TV One HR issues," and told her that, "[Ms. Hughes] wants [Plaintiff] on administrative leave," and instructed Ms. Alston to tell Plaintiff not to report to Los Angeles for a planned photo shoot because she is on administrative leave. (*Id.* at 73, pp. 286-87). According to Defendant, Ms. Alston and Ms. Kindall agreed during their conversation that they would investigate the matter between Plaintiff and Ms. Hughes. Ms. Alston would speak with Plaintiff regarding the dispute and Ms. Kindall would speak with Tony Washington and Jody Williams who were "witnesses to the conversation with [Plaintiff] and Ms. H[ughes]." (ECF No. 89-8, at 47-49, pp. 182-90). Ms. Alston then called Mr. Washington and Ms. Williams, who corroborated Ms. Hughes' account of the June 22 phone conversation with Plaintiff. (*Id.*). According to Plaintiff, this investigation was a cover-up for Ms. Hughes'

instructions to Ms. Kindall the day before to fire Plaintiff. (ECF No. 90-13, at 38, pp. 146-47).

When Plaintiff spoke with Ms. Alston on the morning of June 24 regarding her voice message and e-mail sent on June 23, Plaintiff recounted the phone conversation with Ms. Hughes on June 22 and provided a full history of her treatment by Ms. Hughes at TV One. (ECF No. 90-15, at 2-4). In response, Ms. Alston informed Plaintiff that she was being placed on administrative leave pending an investigation. (ECF Nos. 89-4, at 141, p. 420; 90-6, at 145, pp. 431-32).

In the afternoon on June 24, Ms. Alston met with Ms. Kindall, Linda Vilardo, Radio One's Chief Administrative Officer, and in-house legal counsel, to discuss her investigation of the dispute between Plaintiff and Ms. Hughes. (ECF No. 89-8, at 64, pp. 250-52). According to Defendant, at that meeting, Ms. Vilardo determined that Plaintiff's employment should be terminated for insubordination. (ECF Nos. 89-8, at 80, pp. 314-15; 89-15, at 73, p. 283; 89-16, at 34, p. 131). Plaintiff was not notified of the decision to terminate her employment on June 24 because, on June 25, Ms. Kindall was preparing a severance package to be offered to Plaintiff. (ECF Nos. 89-8, at 91, p. 358, 95, p. 373-74, 160-61; 89-16, at 42, pp. 163-64). On the morning of June 26, Plaintiff sent to Ms. Alston a written complaint against Defendant for gender

discrimination and harassment. (ECF No. 89-4, at 144, p. 434,
375; 90-18, at 2). Later that day, Plaintiff was informed by
letter that her employment had been terminated effective June
24. (ECF Nos. 89-4, at 148, pp. 448-49, 377-389; 90-19, at 2-
3).

### B. Procedural Background

On March 13, 2017, Defendant moved for summary judgment.
(ECF No. 89). On March 27, Plaintiff filed an opposition and
moved for summary judgment with respect to Defendant's seventh
and ninth affirmative defenses asserted in its answer. (ECF No.
90). Defendant replied and filed an opposition to Plaintiff's
motion on April 10. (ECF No. 91). Plaintiff filed a reply and
amended reply to Defendant's opposition. (ECF Nos. 92; 93).

## II. Standard of Review

A motion for summary judgment will be granted only if there
exists no genuine dispute as to any material fact and the moving
party is entitled to judgment as a matter of law. *See*
Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250
(1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). To
prevail on a motion for summary judgment, the moving party
generally bears the burden of showing that there is no genuine
dispute as to any material fact. *Liberty Lobby*, 477 U.S. at
248-50. A dispute about a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 249. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).

When faced with cross motions for summary judgment, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation and internal quotation marks omitted). The court reviews each motion under the familiar standard for summary judgment outlined above. *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011). The court must deny both motions if there is a genuine dispute of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will

render judgment." 10A Charles A. Wright, *et al.*, Federal
Practice & Procedure § 2720 (3d ed. 1998).

## III. Analysis

### 1. Gender Discrimination

Under Title VII, it is unlawful for an employer "to
discriminate against an individual with respect to . . . terms,
conditions, or privileges of employment because of such
individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). In Count
I, Plaintiff asserts claims of gender discrimination based on
unlawful harassment in violation of Title VII.[3]

> Courts have long endorsed and adopted the
> EEOC's interpretation that sexual harassment
> is a form of prohibited sex discrimination.
> *See Meritor Sav. Bank, FSB v. Vinson*, 477
> U.S. 57, 65-66 (1986). Actionable workplace
> sexual harassment claims come in two forms:
> (1) claims of a hostile work environment due
> to severe or pervasive sexual harassment and
> (2) claims of *quid pro quo* sexual
> harassment. *See Fitter v. Cmty. Imaging
> Partners, Inc.*, 735 F.Supp.2d 379, 390
> (D.Md. 2010).

*Bruce v. Fair Collections & Outsourcing, Inc.*, No. CCB-13-3200,
2014 WL 3052477, at *3 (D.Md. June 30, 2014). Here, Plaintiff
claims that she was subjected to a hostile work environment on
the basis of gender as a result of "severe and pervasive

---

[3] In the court's memorandum opinion denying Defendant's
motion to dismiss, the court dismissed Plaintiff's claims to the
extent that Count I alleges unlawful gender discrimination
beyond a claim for hostile work environment. (ECF No. 27, at
18).

harassment . . . by her supervisors." (ECF No. 16 ¶ 82). To establish a hostile work environment claim based on gender, Plaintiff must show that: (1) the harassment was unwelcome; (2) the harassment was based on her gender; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *See Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 266 (4th Cir. 2001).

### a. Timeliness

Defendant first argues that Plaintiff's claims of discrimination and harassment are time-barred because the alleged discriminatory acts occurred more than 300 days before Plaintiff filed her EEOC charge on August 5, 2014. (ECF No. 89-1, at 19). Plaintiff contends that the continuing violation theory applies to her hostile work environment claim and allows the court to look beyond the EEOC filing period. (ECF No. 90-1, at 32).

Generally, under Title VII, a charge of discrimination must be filed with the EEOC within 180 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1). In a "deferral" jurisdiction, however, the period is extended to 300 days. *See Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 n.3 (4th Cir. 2002); *Prelich v. Med. Res., Inc.*, 813 F.Supp.2d 654, 661 (D.Md. 2011). Maryland is a deferral state

under Title VII, and the 300-day timeframe applies.  *See, e.g.*, *Burgess v. Sys. High Corp.*, No. ELH-14-3895, 2015 WL 6956516, at *3 (D.Md. Nov. 10, 2015).  The statutory window applies to any "discrete acts" of discrimination, "such as termination, failure to promote, denial of transfer, or refusal to hire . . . .  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).  "Charges filed outside [the statutory window] are barred, but a discriminatory allegation may still constitute relevant background evidence for valid claims." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)).

> Under the continuing violation theory, "[i]f one act in a continuous history of discriminatory conduct falls within the charge filing period, then acts that are plausibly or sufficiently related to that act, which fall outside the filing period, may be considered for purposes of liability." *Lewis v. Norfolk S. Corp.*, 271 F.Supp.2d 807, 812 (E.D.Va. 2003).  The continuing violation theory applies to hostile work environment claims, which are "composed of a series of separate acts that collectively constitute one unlawful employment practice" and are timely if "any act contributing to the claim occur[red] within the filing period." [*Morgan*, 536 U.S. at 117] ("It does not matter . . . that some of the component acts of the [claim] fall outside the statutory time period.").

> The acts that occur within the filing period
> need not, standing alone, constitute a
> violation of Title VII for the continuing
> violation doctrine to apply. *See Gilliam v.*
> *S. Carolina Dep't of Juvenile Justice*, 474
> F.3d 134, 141 (4th Cir. 2007).

*Williams v. Silver Spring Volunteer Fire Dep't*, 86 F.Supp.3d
398, 411 (D.Md. 2015); *see White v. BFI Waste Servs., LLC*, 375
F.3d 288, 293 (4th Cir. 2004) (holding that a hostile work
environment claim "may appropriately extend even to acts that
occurred before the relevant limitations period, because the
hostile work environment continued within the limitations period
as well").

Here, Plaintiff testified in deposition that the alleged
offensive conduct by Ms. Hughes and Mr. Liggins commenced with
Ms. Hughes' comments urging a romantic relationship with Mr.
Liggins in late October 2004 (ECF No. 90-6, at 45, p. 173),
outside the 300-day filing period. Plaintiff further testified
that the offensive conduct continued throughout the tenure of
her employment with TV One (*Id.* at 25-26, pp. 90-97, 31-32, pp.
114-21, 46, pp. 176-77, 49, pp. 187-89, 50, pp. 190-92, 53-55,
pp. 205-13, 56-57, pp. 215-18, 124, pp. 347-50), and culminated
with Mr. Liggins' statements at a gathering of TV One employees
in January 2014 and her termination after a dispute with Ms.
Hughes in June 2014 (*Id.* at 27-28, pp. 101-02, 138-39, pp. 405-
10), within the 300-day filing period. Viewing the evidence in

the light most favorable to Plaintiff, Plaintiff has identified specific acts within the limitations period that contributed to the hostile work environment. Therefore, the continuing violation doctrine might apply, and Defendant's motion on this issue will be denied. *Morgan*, 536 U.S. at 117; *Zidan v. Maryland*, No. SKG-10-1792, 2012 WL 2923150, at *7 (D.Md. July 7, 2012) (holding that the plaintiff's claim for hostile work environment was not time barred because the plaintiff testified in deposition that the alleged offensive conduct continued up until her termination, within the limitations period).

### b.  Harassment Based on Gender

Defendant next argues that "Plaintiff cannot establish gender-based harassment because the incidents about which she complains had nothing whatsoever to do with her sex." (ECF No. 89-1, at 23).

To establish that the conduct was based on gender, Plaintiff must show that "but for" her gender, she "would not have been the victim of the alleged discrimination." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000) (citation omitted). Gender-based animosity can be shown by direct evidence of discrimination, or differential treatment of similarly situated male employees. *See Gilliam*, 474 F.3d at 142; *Causey v. Balog*, 162 F.3d 795, 801-02 (4th Cir. 1998). Plaintiff need not show that "sexual advances or propositions"

were involved. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (internal citation omitted).

In *Ocheltree*, the United States Court of Appeals for the Fourth Circuit determined that "much of the sex-laden and sexist talk and conduct in the production shop was aimed at [the plaintiff] because of her sex . . . . Much of the conduct, a jury could find, was particularly offensive to women and was intended to provoke [the plaintiff's] reaction as a woman." *Id.* at 332. Plaintiff testified in deposition that Ms. Hughes repeatedly stated that she wanted Plaintiff to marry Mr. Liggins and would introduce Plaintiff to colleagues as her "future daughter-in-law," fueling workplace rumors of a romantic relationship between Plaintiff and Mr. Liggins. (ECF No. 90-6, at 25, p. 92, 46, pp. 176-77, 49, pp. 188-89). On another occasion, Ms. Hughes commented to Plaintiff that she did not know why Plaintiff had not married Mr. Liggins yet, stating that Plaintiff was old and her babies would likely be retarded. (*Id.* at 49, p. 187, 54, p. 207). Plaintiff's testimony that she was the subject of workplace rumors that she and Mr. Liggins were romantically involved (*Id.* at 25-26, pp. 90-95) is corroborated by former TV One Executive Vice President and Chief Legal Officer Karen Wishart's deposition testimony that she heard about the rumors from other TV One employees (ECF No. 90-7, at 28, p. 101). When Plaintiff went to Mr. Liggins to address the

rumors, Mr. Liggins responded, "at least it makes me look good."
(ECF No. 90-6, at 32, p. 118). Viewed in the light most
favorable to Plaintiff, a reasonable jury could find that, but
for her status as a woman, Plaintiff would not have been
subjected to the alleged offensive conduct by Ms. Hughes and Mr.
Liggins and the workplace rumors that she was involved
romantically with Mr. Liggins.

    **c.   Severe and Pervasive Conduct**

Defendant further argues that it is entitled to summary
judgment on Plaintiff's hostile work environment claim because
Plaintiff cannot establish that the alleged offensive conduct
was sufficiently severe and pervasive.

A hostile work environment is marked by "extreme" conduct,
and "simple teasing, offhand comments, and isolated incidents
(unless extremely serious) will not amount to discriminatory
changes in the terms and conditions of employment." *Faragher v.*
*City of Boca Raton*, 524 U.S. 775, 788 (1998). The conduct must
be both subjectively and objectively offensive in order to be
cognizable under Title VII. *Id.* at 787; *EEOC v. Sunbelt*
*Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). In determining
whether the offending conduct was sufficiently severe or
pervasive, the court must consider: "(1) the frequency of the
discriminatory conduct; (2) its severity; (3) whether it is
physically threatening or humiliating, or a mere offensive

utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Smith*, 202 F.3d at 242; *see also Sunbelt Rentals*, 521 F.3d at 315. Furthermore, "[t]he behavior need not be both severe and pervasive: the more severe the conduct, the less pervasive the plaintiff need prove that it is." *Reed v. Airtran Airways*, 531 F.Supp.2d 660, 669 n.15 (D.Md. 2008) (citations omitted). Plaintiffs in the Fourth Circuit

> must clear a high bar in order to satisfy the severe or pervasive test. Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than "rude treatment by [coworkers]," *Baqir v. Principi,* 434 F.3d 733, 747 (4th Cir. 2006), "callous behavior by [one's] superiors," *Bass,* 324 F.3d at 765, or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 276 (4th Cir. 2000), are not actionable under Title VII.

*Sunbelt Rentals*, 521 F.3d at 315-16. "[A] supervisor's strict management style or degree of supervision is not evidence of actionable harassment. However, a work environment can be considered hostile if it is consumed by remarks that intimidate, ridicule, and maliciously demean the status of women." *Engler v. Harris Corp.*, No. GLR-11-3597, 2012 WL 3745710, at *5 (D.Md. Aug. 28, 2012) (citations and internal quotation marks omitted).

Plaintiff has presented evidence that, beginning in 2004, Ms. Hughes repeatedly stated that she wanted Plaintiff to marry Mr. Liggins and would introduce Plaintiff to colleagues as her "future daughter-in-law." (ECF No. 90-6, at 25, p. 92, 46, pp. 176-77, 49, pp. 188-89). Ms. Hughes often stated her desire for Plaintiff and Mr. Liggins to marry in front of others, fueling workplace rumors of a romantic relationship between Plaintiff and Mr. Liggins. (*Id.* at 25, p. 92). Plaintiff heard these rumors from multiple colleagues in the workplace "too many [times] to count" and the rumors "never stopped." (*Id.* at 25-26, pp. 93-94). Even after Plaintiff married her husband in 2012, she was subjected to jokes that she "[should have] just married [Mr. Liggins] like [she] was supposed to." (*Id.*). According to Plaintiff, when Ms. Hughes realized that Plaintiff was not going to marry Mr. Liggins she began to continuously harass Plaintiff, including publicly berating Plaintiff in front of her co-workers (*Id.* at 53-54, pp. 205-07); demanding that Plaintiff make requests for talent in a manner contrary to standard industry protocol (*Id.* at 54-55, pp. 208-13); and chastising Plaintiff for taking time off for her wedding and honeymoon (*Id.* at 56-57, pp. 214-18).

Plaintiff has also presented evidence that, in addition to being frequent and pervasive, the conduct was sufficiently severe to create a hostile work environment. "When evaluating

the context in which harassment takes place, [the Fourth Circuit has] often focused on the disparity in power between the harasser and the victim." *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) (citation and internal quotation marks omitted). The severity of the alleged harassment is exacerbated when a supervisor is the tormentor. *See Emond v. Corr. Med. Servs., Inc.*, No. JKB-10-1680, 2011 WL 2712749, at *7 (D.Md. July 12, 2011). As Ms. Hughes and Mr. Liggins exercised significant authority over Plaintiff, the severity of the alleged harassment is enhanced. In addition, degrading and humiliating conduct can be severe or pervasive even if not physically threatening. *See Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 698-99 (4th Cir. 2007). Plaintiff has presented evidence that she began therapy in 2008 to cope with depression resulting from Ms. Hughes' conduct, workplace rumors, and colleagues thinking that she only got her job by sleeping with Mr. Liggins. (ECF No. 90-6, at 157-58, pp. 479-84). Certainly, the effect on the employee's psychological well-being is relevant to determining whether the environment was hostile or abusive. *Harris v. Forklift Systems*, 510 U.S. 17, 22-23 (1993). Drawing all reasonable inferences in the light most favorable to Plaintiff, a reasonable jury could conclude that the alleged conduct was so severe or pervasive that it created a hostile work environment.

**d. Affirmative Defense**

Defendant argues that even if Plaintiff can establish a *prima facie* case for hostile work environment, it cannot be held liable because (1) it exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (2) Plaintiff unreasonably failed to take advantage of preventative or corrective opportunities. (ECF No. 89-1, at 30).

The holdings of *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), establish that an employer is not vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee when:

> (a) [ ] the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and

> (b) [ ] the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth*, 524 U.S. at 765. The *Faragher/Ellerth* defense is not available to an employer, however, when a "supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 808 (citing *Ellerth*, 524 U.S. at 762-63). Fourth Circuit precedent requires "some nexus between the harassment and the tangible employment action" for the defense to become

unavailable. *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 332 (4th Cir. 2012); *see also Lissau v. S. Food Serv.*, 159 F.3d 177, 182 (4th Cir. 1998) ("Tangible employment actions, if not taken for discriminatory reasons, do not vitiate the affirmative defense."). Plaintiff argues that the affirmative defense is not available to Defendant because a tangible employment action was taken against Plaintiff. (ECF No. 90-1, at 44-45). In its reply, Defendant asserts that because the decision to terminate Plaintiff was unrelated to the alleged harassment, the affirmative defense is still available to it. (ECF No. 91, at 19-20). Here, Plaintiff's discharge was unquestionably a tangible employment action. A genuine dispute of material fact exists, however, as to whether some nexus exists between the alleged harassment by Ms. Hughes and Plaintiff's termination. According to Defendant, its decision to terminate Plaintiff's employment was made on June 24, 2014, after concluding that Plaintiff was "belligerent" and "insubordinate" to Ms. Hughes on June 22. (ECF Nos. 89-8, at 64, pp. 249-52, 71, p. 278, 75, pp. 294-95, 79, p. 312, 80, pp. 314-15; 89-15, at 63, pp. 242-43; 89-16, at 34, pp. 130-31). However, Plaintiff has presented evidence that in the afternoon on June 23 - before any investigation by Ms. Kindall and Ms. Alston and before Defendant's alleged termination decision - Ms. Hughes instructed Ms. Kindall to discharge Plaintiff (ECF No. 90-13, at 38, p.

146).  Drawing all reasonable inferences in the light most favorable to Plaintiff, a reasonable jury could find a nexus between the alleged harassment by Ms. Hughes and the decision to discharge Plaintiff.  Therefore, a genuine dispute of material fact exists as to whether the *Faragher/Ellerth* defense is available to Defendant, and Defendant's motion for summary judgment on Plaintiff's hostile work environment claim will be denied.

### 2.  Retaliation

Defendant next argues that summary judgment should be granted against Plaintiff on her retaliation claim because Plaintiff cannot establish that she engaged in protected activity or that "but for" her alleged protected activity she would not have been discharged.  (ECF No. 89-1, at 32).

To establish a *prima facie* case of retaliation, Plaintiff must show the following elements: (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal connection between the protected activity and the adverse employment action.  *See Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 443 (4th Cir. 1998).  The plaintiff's burden in this regard is "not onerous," and requires only that she prove each element by a preponderance of the evidence.  *See Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).  If the plaintiff makes such a

showing, the burden shifts to the employer to offer a non-discriminatory basis for the adverse employment action. *See Matvia*, *259* F.3d at 271. The employee then has the opportunity to prove that the asserted reason is pretextual. *Id.; see also Smith*, 202 F.3d at 248 ("The *McDonnell Douglas* burden-shifting scheme applies in analyzing retaliation claims under Title VII.").

Title VII makes it unlawful for "an employer to discriminate against any of [its] employees . . . because [s]he has opposed any practice made an unlawful practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "Protected activity of an employee, therefore, can take the form of either opposing a practice prohibited under Title VII (pursuant to the opposition clause) or making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII (pursuant to the participation clause)." *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F.Supp.2d 379, 395 (D.Md. 2010).

### a. Protected Activity

Defendant argues that Plaintiff cannot show that she engaged in protected activity because "refusal of a suggestion of marriage is not protected activity as a matter of law." (ECF

No. 89-1, at 33). Here, Plaintiff has presented evidence showing that she engaged in protected activity by (1) making an informal complaint to Human Resources Vice President Sharon Alston when she left a voice message on June 23, 2014, alleging harassment by Ms. Hughes (ECF No. 90-11, at 2-3); and (2) submitting a complaint via email to Ms. Alston against Defendant for "gender discrimination and harassment" on the morning of June 26, 2014 (ECF No. 90-18, at 2). *EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005) ("[P]rotected oppositional activities may include 'staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities,' as well as 'complain[ts] . . . about suspected violations.'" (internal citations omitted)).

In its reply to Plaintiff's opposition, Defendant contends that Plaintiff's verbal complaint on June 23 does not constitute protected activity because nothing in her voicemail indicates that she was alleging gender-based harassment. (ECF No. 91, at 14). In her verbal complaint, Plaintiff stated that she was "making a complaint against Ms. Hughes for harassment," that Ms. Hughes "cursed [her] out . . . when [she] told her that [she] was with [her] husband's family in Minnesota," and that Ms. Hughes "wants [her] fired because . . . [she] wouldn't marry [Mr. Liggins]." (ECF No. 90-11, at 2-3). Title VII "protects

activity in opposition not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful." *Navy Federal*, 424 F.3d at 406; *see also DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (noting that the Fourth Circuit interprets "unlawful employment practice" broadly). As noted above, Plaintiff has put forth sufficient evidence that, prior to her complaint on June 23, she was subjected to gender-based harassment in the workplace, including Ms. Hughes repeatedly urging a romantic relationship between Plaintiff and Mr. Liggins and Ms. Hughes publicly berating Plaintiff in front of co-workers once Ms. Hughes realized that Plaintiff was not interested romantically in Mr. Liggins. In light of the facts and record presented, there is sufficient evidence that Plaintiff held a subjectively and objectively reasonable belief that Ms. Hughes' offensive conduct, because of her refusal to marry Mr. Liggins, was an unlawful employment practice. *See Adams v. Giant Food*, 225 F.Supp.2d 600, 606 (D.Md. 2002). Therefore, Plaintiff has put forth sufficient evidence that she engaged in protected activity when she made a verbal complaint to Ms. Alston on June 23.

**b. Causal Connection Between Protected Activity and Termination**

Defendant argues that even if Plaintiff engaged in protected activity, Plaintiff cannot show that but for her protected activity she would not have been terminated because (1) regardless of any protected activity, Defendant would have fired Plaintiff for being belligerent and insubordinate to Ms. Hughes on June 22, 2014; and (2) Plaintiff's alleged protected activity came after Defendant's decision to terminate had been made on June 24. (ECF No. 89-1, at 33, 34).

"Normally, very little evidence of a causal connection is required to establish a *prima facie* case." *Pitter*, 735 F.Supp.2d at 396 (citation omitted). If the employer takes the adverse employment action "shortly after" learning about the protected activity, courts may infer a causal connection between the two. *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogation on other grounds recognized by Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017). Where temporal proximity is the only evidence of causation, however, "the temporal proximity must be very close," as it is here. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). According to Defendant, the decision to terminate Plaintiff was made on June 24 and communicated to Plaintiff on June 26. Defendant argues that because it made a tentative decision to discharge

Plaintiff on June 24, before Plaintiff submitted her written complaint on June 26, the fact that it proceeded with its decision to discharge Plaintiff does not demonstrate causality. (ECF No. 89-1, at 37) (*citing* Breeden, 532 U.S. at 272). Defendant's argument fails, however, because even assuming that it made a tentative decision to terminate Plaintiff on June 24, that decision was made the day after Ms. Alston learned about Plaintiff's complaint alleging harassment by Ms. Hughes on June 23. (ECF Nos. 90-11, at 2-3; 90-12, at 2). Under these facts, there is sufficient evidence of a causal connection between the protected activity and the adverse employment action. Therefore, Plaintiff has put forth sufficient evidence to support her retaliation claim.

Defendant has set forth legitimate, non-discriminatory reasons for Plaintiff's termination, *i.e.*, that she was terminated for being belligerent and insubordinate to Ms. Hughes on June 22. (ECF No. 89-1, at 34). Thus, the burden returns to Plaintiff to prove by a preponderance of the evidence that Defendant's reasons were not its true reason, but were pretext for discrimination. *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). Plaintiff argues, *inter alia*, that "the fact that Ms. Hughes told Ms. Kindall that [Plaintiff] was to be fired proves that any subsequent investigation and conclusion were pretextual." (ECF

No. 90-1, at 42). Although Defendant insists that Ms. Kindall
was the investigator into the dispute between Plaintiff and Ms.
Hughes on June 22, and Linda Vilardo was the decision maker for
Plaintiff's termination, Plaintiff has presented evidence that
on June 23 – before Defendant's alleged decision to terminate
Plaintiff on June 24 – Ms. Hughes instructed Ms. Kindall to have
Plaintiff fired. (ECF No. 90-13, at 38, p. 146). Although
"[t]he court 'does not sit as a kind of super-personnel
department weighing the prudence of employment decisions,'"
*Hunter v. Vilsack*, No. DKC-07-2655, 2010 WL 1257997, at *12
(D.Md. Mar. 26, 2010) (citations omitted), "a complaining party
may demonstrate that discrimination motivated an adverse
employment action if . . . the individual with the
discriminatory animus 'possessed such authority as to be viewed
as the one principally responsible for the [adverse employment]
decision or the actual decisionmaker for the employer,'" *Vicino
v. Maryland*, 982 F.Supp.2d 601, 611 (D.Md. 2013) (citations
omitted). Here, although Defendant has proffered non-
discriminatory reasons for Plaintiff's termination, Plaintiff
has presented sufficient evidence that the reasons for her
termination were pretext for discrimination. Therefore,
Defendant's motion for summary judgment on Plaintiff's
retaliation claim is denied.

**IV. Plaintiff's Cross Motion for Summary Judgment**

Plaintiff moves for summary judgment with respect to Defendant's seventh and ninth affirmative defenses asserted in its answer. Plaintiff argues that because Defendant took a tangible employment action against her, the affirmative defense is not available to Defendant. (ECF No. 90-1, at 44-45). Defendant argues in its opposition that, because the decision to terminate Plaintiff was unrelated to the alleged harassment, the affirmative defense is still available to it. (ECF No. 91, at 19-20).

The *Faragher/Ellerth* defense is not available to an employer when a "supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 808 (citing *Ellerth*, 524 U.S. at 762–63). However, "some nexus between the harassment and the tangible employment action" is required for the defense to become unavailable. *Dulaney*, 673 F.3d at 332.

As noted above, a genuine dispute of material fact exists as to whether some nexus exists between Plaintiff's termination and Ms. Hughes' alleged harassment and thus whether the affirmative defense is available to Defendant. Therefore, Plaintiff is not entitled to summary judgment with respect to Defendant's use of the *Faragher/Ellerth* defense as a reasonable jury could find the defense to be applicable.

## V.    Conclusion

For the foregoing reasons, the cross motions for summary judgment are denied.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge